May it please the Court, I'm John Andre. I represent the appellant, Mr. Ashcroft, who actually is no longer responsible for the immigration enforcement functions. And I wouldn't have expected him to appear per se. He's a lawyer. Not in this case. So today I'm representing the Department of Homeland Security and the Bureau of Immigration and Customs Enforcement, which has taken over the immigration enforcement functions of the former INS and the Attorney General. I would first like to bring the Court up to date on Mr. Chinosh's administrative proceeding. He had a ---- All of that is probably irrelevant if we don't have a live controversy before us with respect to the preliminary injunction. Well, I think that actually the updated information is directly relevant to that question of whether or not there's a live controversy. I don't have any ---- I'll be happy to hear from you. But my point is all we have in front of us is an appeal from the preliminary injunction, not from other things that may be going on in the underlying action, which is still pending. Yes, that's correct. All right. So first, with respect to the preliminary injunction, why can it be live when the INS consented to an order that it didn't like, but it consented to have the dependency proceeding go forward? The proceeding did go forward, and an order was issued. The INS consented because it was directed to. So what? I mean, it could have sought a stay, it could have appealed, it could have refused. Well, the reason we ---- We could have done any of the ordinary things that people do when they're on the short end of a preliminary injunction that they dislike. Normally, they appeal it really fast. Well, we did. That's why we're here. Well, but it's done ---- you didn't seek a stay. No. So everything that's happened has happened. Right. Well, the consent happened, but the reason ---- The proceeding's happened, and an order is issued. Yes. But the reason that it wasn't necessary in our view to seek a stay was because we believe that the appeal of the injunctive order would not move down because there is underlying importance and significance to the validity of the State dependency order in the ongoing proceeding before the district court. Well, that may be the case. In fact, that just makes it ---- the more important it is, the more compelling the need to get a stay on it and get it resolved before it actually all went down. Because at this point, I'm just hard-pressed to see what this Court can do to unravel it. Well, our position on that question is simply that the question of the validity of the dependency order is relevant to the ongoing proceeding. And Mr. Chenek has a proceeding ongoing before the district court. He has not argued that his district court proceeding is moot, and he wants to be ---- I understand that, and it isn't. There's no question about that. The action that's under ---- the underlying action is not moot. But this doesn't have to do with the underlying action. It has to do with the preliminary injunction. I think that's where we're ---- It's just being totally moot. With respect, I think that's where we part company, because this has everything to do with the underlying action, because what he is contesting in the action below ---- Counsel, what you're misunderstanding, it has everything to do with the underlying action, one supposes, because if he did not get his order from the State court, his situation would be considerably weaker now. But that's not the nature, I think, of Judge Reimer's question. It's certainly not the nature of my question, when he did get his order from the State court. We can't set that aside. He's got it. He is now a ---- I mean, this may be, as I'm sure you would argue, this is exactly what Congress wanted to avoid. The State court rushes in with a guy who's almost 18, slaps him under guardianship of some kind, State proceeding. But that's happened, and we can't set that aside. Now, you might argue that the effect of that should be zip in the long run, but that's not what's in front of us. All that's in front of us is, did the district judge improperly order you into State court? And you want us to say, yes, it did. And once we say, yes, it did, there's still the State court order outstanding. It's not. That's correct. There will still be a State court order, and this Court does not perhaps have the authority to set that aside. But what the Court ---- what this Court can set aside is the district court's order, which ordered the Attorney General to consent to begin with. And once that order is set aside, that has the impact, that has the same effect as invalidating the State court's dependency order. You just don't get that at all. I don't understand why that wouldn't be so. I guess I don't understand why it would be. Because if it's just ---- It's meaningless. The court order is the dependency order exists. Well, but it exists, but if the consent ---- it only exists because there was consent. And if this Court were to go ---- No, it exists now. It shouldn't ---- it couldn't have been held under the ---- your view without it. Are you saying it's subject to an appeal and that if you can show the consent was withdrawn, it would be undone in State appeal? Is that what you're saying? The Federal Government is not a party in the State court proceeding. The Federal Government didn't have the opportunity. There's nobody who's going to appeal, and the Federal Government doesn't plan to intervene to participate. No. You're not saying that withdrawal of the Attorney General's consent would somehow affect further proceedings in State court? No. But I'm sorry. If I suggested that, I missed the point. No, I'm just ---- I'm passing the possibilities. I'm just saying that's not what you're saying. That order exists. That order will stay out there. The order stays out there. What is the on ---- what affects the ongoing controversy in this case and the case from which we have appealed is the question of whether or not the State dependency order is valid with respect to whether or not he should get a special immigrant juvenile visa. Maybe you can sharpen this. Let's go to the statute. That might help me anyway. Statute says that you can get this status if the Attorney General expressly consents to the dependency order serving as a precondition. He consents to that. Separately, it says that no juvenile court shall issue such an order unless the Attorney General consents to that, to the jurisdiction. The district court says, thou shalt consent to the jurisdiction. Attorney General did, that's done, and now there's an order. Yes. No doubt, the proceeding ---- no doubt, one still has to consider whether the Attorney General is going to consent to that order serving as the precondition. But that's not what's in front of us today. What's in front of us today is the J, little Roman numeral III, capital Roman numeral I, consent to the jurisdiction of the juvenile court. You did that. It's acted. And then? And the question is whether or not the district court properly entered that order to demand and to require the Attorney General to consent. Of course. That restates the question, and that is the question. Yes. But the problem is we can't give you any relief on that. Yes, Your Honor. Because you have consented to the jurisdiction and the order's been issued. Now, whether you ---- whether he wins in the long run in light of congressional purpose and such, that's a different question. But the question is, you have in front of us, you've appealed the order directing you to consent. You did consent. The juvenile court has acted. We can't do anything about that. Can we? What can we do about that? Well, I think what the Court is essentially suggesting is that the government cannot take an appeal from this kind of an order unless it gets a stay. No. Well, yes. Well, you know, there's lots of times that's the case in our little world. In bankruptcy law, it happens all the time. If you take an appeal from an order of the court and you don't get a stay, you lose. It becomes moot. It's not that you can't take an appeal. And maybe the answer is when you take that appeal and ask for the stay, you say to us, look, stupids, if you don't give us a stay, it's going to become moot. You've got to give us a stay. That should have a lot of influence on us. But if we say, eh, we're not going to do it, yeah, you're right. You're out. It becomes like a cert appeal in that case. It sort of becomes like cert. I'm saying the government can't take an appeal, go for cert to the Supreme Court if it denies it. So that's all that happens. With all due respect, I do believe that there is still a case of controversy in the sense that there is an ongoing district court case. And I just would like to bring to the Court's attention the question of whether or not the Supreme Court can take an appeal. I'm not ruling because I would help you in the district court a great deal. Well, it would affect the ultimate question that Mr. Chen I said brought in the district court. But you can get the – that issue resolved if you lose on the final judgment. That's – that would be correct. But the government does have a right to take an appeal from the interlocutory order granting it from you. No cert base. Pardon me? I think we're back to where we were. Yeah. Well, if I just might, maybe shed a little bit of light. What is the real world, not the inside the courtroom world, okay? So let's sort of consider the real world, all places, not inside of a federal courtroom, okay? What would be the real world consequences of our entering an order vacating an injunction? The real world consequence is that Mr. Chen could not receive a special immigrant juvenile visa because the Attorney General did not consent to State dependency proceedings. Received the visa from whom? From the immigration law firm. But he did consent. The Attorney General did consent. He did consent. I mean, that's the problem. He may have consented because he – because of the court order. He may have consented because he felt like it. He may have consented because he had bad legal advice. Well, but if the district – He did consent. So just getting rid of the order isn't going to get rid of the consent. If the court were to reverse the district court's order, that would be a determination that the order was in error. Well, so what? Okay. So if I say right now, okay, fine, the error was in order, it was wrong, there was no basis for it at all, okay, fine, I've said it, now what? That means if the – It doesn't undo the consent, it doesn't undo the dependency proceeding, and it doesn't undo the dependency order. Going back to the language of the statute, consent – Mr. Ashcroft should have gone to jail instead, refused to give the consent and gone to jail. Just going back to the – He should have preserved the – If I may just go back to the language of the statute that Judge Fernandez was bringing up, consent itself is a term that is – suggests a voluntary action. Consent is no such thing as an involuntary consent. And if somebody is forced to do something – Are you going to give random warnings to the Attorney General now? Knowing involuntary. In any event, I would like to bring to the Court's attention a decision by the Administrative Appeals Unit of the Immigration Agency, which I was just made aware of this morning. The Administrative Appeals – is that like the old BIA? Well, no. This is the appeals unit which takes care of the adjudication of the visa. It did not go to the Board of Immigration Appeals. The denial of his special immigrant visa, which we brought to the Court's attention in our appendix to the reply group, the – Mr. Chanax took an appeal from that to the Administrative Appeals Unit in the Immigration Agency. And we were just – I was just informed this morning that the Administrative Appeals Unit has sent that case back to the district and held the case, held the determination of the appeal pending this Court's determination of this appeal. In other words, the Administrative Appeals Unit – Sell? Well, that's – that's – I think that's another indication of why this proceeding is relevant to the underlying claim that Mr. Chanax has in the district court, which involves the validity and the correctness of the denial of his special immigrant visa. Essentially, the agency is saying, we cannot do anything until this Court makes a determination of whether or not the attorney general – Well, gee whiz, it sure seems to me it can. It can say he's entitled to it or he's not entitled to it, and give reasons, and then fight it out in the district court and then come back up here. But I think that the reason that the agency did not do that, and it didn't give specific reasons, but the reason it did not was because it recognized that the question of consent is directly relevant and vital to the question of whether or not he did it. Well, if that's true, then perhaps the advice to go back to them is they consent to it. I'd like to reserve a bit of time for rebuttal. I take it you don't – we don't owe Chevron deference on the question of mootness? The – on the question of the internal memorandum, the guidelines? No. If we think it's moot and the agency's waiting for us, we don't owe it deference. No, no. Not on the mootness question. Thank you. Good morning, and may it please the Court. I'm James Lynch. I'm with – How are you, Mr. Lynch? I'm very well, thank you. Were you here a little bit earlier? Earlier change? Yes, we were, and I was going to make that point just now, Your Honor. Do you think any interaction with him is going to be great? There is not, Your Honor. I'm prepared to answer questions, but we agree that the matter is moot, and if there are no questions, I'm prepared to rest. Thank you so much, case. This argument stands committed. Thank you. The next here argument is Nunes v. Baca. Good morning, Your Honors. How are you? I'm fine, sir. My name is Luis Carrillo. I represent Emma Nunes and Gabriela Petranz in the incident. Proceeding. Your Honor, what I'm going to do is just briefly start out at, I think, what should be the shortest part of the argument, or for me, the easiest part of the argument, which is to deal with the issue of the district court's refusal to permit the amendment of the complaint to add four deputies as though defendants, and then from there move to the district court's granting of summary judgment in favor of the county. May I hone in on the thing that bothers me about that? You know, you seem to argue that you should have had leave to amend under Rule 15, but I would think that Rule 16 controls because this was a scheduling order with a discovery cutoff that was being enforced, and that requires a showing of good cause. My specific question is that you got the investigative report on December 14th and didn't request leave to amend until June. The police report is quite comprehensive, and it identifies everybody, including the four deputies, as to whom you sought, who were principally involved. I think one of them's name was misspelled, but pronouncing it would produce the same result. So what is the basis for a good cause showing and for reversing it? Your Honor, I agree with you. I think that you're absolutely correct. This case should be guided by Rule 16 and not 15, in which case I have to show good cause. And I believe that the good cause is the following, Your Honor. First of all, the report, the ICIB Sheriff's Department report, does not list two of the persons, two of the deputies that I wanted to add as DOE defendants, does not list them as suspects, but merely as witnesses. You can read at the excerpts of record at page 190, 191, where Deputy Ponce and Deputy and Sergeant Cassidy is listed as witnesses, as opposed to suspects. But they were involved, I mean. But not in the way that the ICIB Sheriff's report unfolded. It does not describe exactly how they were involved. And that's where I've tried to go to great lengths to explain how I believed that the ICIB report consisted of very soft questioning of these deputies, and including Sergeant Cassidy, which really didn't get the truth out, didn't get the truth out as to their full involvement. And I tried to highlight, for example, how Deputy Ponce stated to the sheriff's investigators of doesn't recall making a call to the first floor or said something to that effect. I mean, isn't it the case that if you just knew that there were A, B, C, and D involved, that it's up to you to take discovery of those people and find out exactly what their involvement is? Or are you suggesting that you have to or can rely entirely upon the investigative report to develop all that stuff for you? No, Your Honor, I agree that it's incumbent upon my duty to take their depositions to find out their full involvement. But the window of opportunity was too short between December 14th and January 18th, when the cutoff date for the amending the pleadings to generate the deposition notices. And there was other factors which were briefly mentioned in the transcript of the proceeding where I was reminding the judge, the district judge, about health problems I had and also about other federal cases that were continued into the new year, this last year, including the three strikes trial in March. So there was a practical limitation of opportunity on the one hand. And then on the other hand, at the first reading of the ICIB report where Ponce and Sergeant Cassidy are listed as witnesses, you really don't get the full flavor and you don't put all the pieces of the puzzle together until you find out, for example, from Deputy Amy Rizziglione, who said Sergeant Cassidy ordered them waist-chained throughout the entire process, which took approximately 12 hours, and then Ponce, during his deposition, where he admits that he ordered a good search, a thorough search, and that Deputy Solis said it's been taken care of. So it's not until you finally get it out of their mouth that you realize the total scope, the totality of how the sheriff's ICIB report was slanted in favor of the deputies and the sheriff's ICIB report. When you read it after, in combination with the deposition testimony, you realize the full extent of, I did, the full extent of the cover-up involved in, to exonerate the deputies. And therefore, what I was asking, and I was trying to convince the district judge, Your Honor, this is good cause to permit the amendment of the deputies. But instead, she threw out the baby with the water and didn't even permit me that part. And I just wanted to briefly talk about other parts of the faction, of the department of the ICIB report, which I was trying to convince the district judge was a sham investigation. For example, in the so-called factual analysis of the ICIB report, they repeat, the investigators repeat the assertion of the deputy who authorized, who requested the strip search authorization, that two women were insisting on going to jail despite low bail amounts. And that was the factual analysis in the ICIB report where it references that assertion. It's identical to the strip search authorization form of one of the deputies when she requested a strip search authorization. Low bail amount, as pointed out, as I try to point out in the record, low bail amounts to someone who's unemployed and is asking for community service of $2,195 and $960 is not a low bail amount. Was there some evidence that, in fact, they did want to smuggle something into the jail? Was there some evidence to that effect? Your Honor, I agree that there was. From their own mouths? No, not from my client's mouth. It was from the sheriff's department, and their reports allege that the Beltran brothers said they wanted to smuggle in some sneakers or something. That's what they allege. But the plaintiffs themselves, the appellants themselves never, never went. But the Beltran brothers thought that's what was going on. They were getting some sneakers smuggled into them. Is that right? That's what the sheriff's department alleged, is that they believed that some sneakers were going to come in. But one of the interesting, you know how at the last minute you find something new in the case? One of the interesting things is the fact that, according to Gabriela Beltran, there was a strip search performed at the Compton Courthouse before they even went to the Twin Towers facility. And besides, the Compton Courthouse is a secure facility with metal detectors. So there was two searches, one through a metal detector, and secondly, a strip search at the Compton Courthouse before they even get to the Twin Towers jail, where they undergo this humiliating and painful intrusion on their body cavities. And I submit, Your Honor, that all of this was because, in my view, if the sheriff's department views someone as hostile or an enemy of the sheriff's, then they have no restraints on them when it comes to getting street justice, so to speak, on those persons. And there's different forms of abuse. There's different forms of excessive use of force, which I was trying to explain to the district court judge. The issue here was not whether L.A. County has a policy permitting painful, humiliating body cavity searches, but whether L.A. County has a policy permitting excessive use of force by sheriff's deputies. And this was one manifestation of excessive use of force, painful body cavity searches on two women who the sheriff's department personnel perceived as hostile or enemies to the sheriff's department. So in my efforts, I was trying to say to the district court judge, Your Honor, there is good cause here to permit the amendment to add the dodefendants, now that the full picture of the puzzle is coming together. And the district court disagreed with me. However, the district court did not take into, moreover, the district court did not take into account the fact that we now know that the witnesses were not witnesses. So Ponce and Cassidy were prime movers or architects in the excessive use of force on the two women. And then the sergeants who investigated this, in effect, rubber-stamped everything that the sheriff's department did. And they went to great lengths in their ICB report to discredit Gabriela Beltran and to discredit another female inmate who they took a statement over the phone and whose deposition was taken, Rebecca, to discredit their testimony. And it's, if you look at the record, and I have the page that's in the... You know, I kind of understand. I realize your clients are unhappy, and they probably have good cause to be unhappy. I'm having a hard time getting my hands around what the constitutional violation is here, or how one would classify it. Maybe there was abuse here, maybe by the nature of having discretion in questions of how to search and whom to search that inherently allows individual officers to exercise discretion in an arbitrary fashion. But other than having us write a code that explains when prisons or jails may use body cavity searches or not, I'm not sure what kind of relief we can give you. You know, here they say they had reason to believe there was a smuggling problem. And it's not wholly without basis. I mean, they are somehow related to these two guys who are on trial. They do this somewhat curious thing of going down to the courthouse, essentially turning themselves in, refusing to pay the bail so they'll wind up landing in jail. Most people would just say, can I have a payment plan, or I'll pay some of the money. I don't have the money today. I mean, most people don't want to go to jail, even for overnight, so they would do what's necessary. So this is somewhat suspicious behavior. And I just have a hard time figuring out how to... Federal courts can second-guess that kind of discretion. Even if we say, gee, the fear of us, if we had been standing there at the elbows of the opposition, and they were asking for our guidance, maybe, okay, unless you say, you know, this is not the right place to do that kind of search. I'm just having a hard time... So there needs to be a case. As to what remedy you could provide? Okay. The violation takes several forms, including the painful body cavity search, deprivation of sleep, being waist-chained even after the strip search, which the Sheriff's Department concedes, and even after the painful body cavity search, which they do not concede. Even after all that, they are still waist-chained, Your Honor, like this. They couldn't go to the bathroom. They had to literally pull down their shorts by the top of one another to use the bathroom. The remedy you could provide is this. If you do not overrule at least part of the district court's decision, the word will continue to filter down to the sheriffs that it's okay to do whatever you damn well please, because not only will the county... Well, Counsel, the point is... Not only... What you're skipping over is the fact that Judge Kaczynski pointed out there was reason to be suspicious of what they were doing. And by the way, your client, Beltran herself, stated later to a witness that she was trying to smuggle shoes in, according to the reports. Okay, I'll look through that part, Your Honor, because all the assertions that she has ever made to me and through the deposition, through the process, was that she was not trying to smuggle in everything. Look at page 14 in the report regarding witness Warren in due course. Yes. But I wanted to add this, Your Honor, is that... Here's some people trying to smuggle something into the jail. They don't know what, and so they're subjected to special kind of treatment, not nice treatment, maybe, to try to find out what it is they're trying to smuggle in, because it's very peculiar what's going on. All right. So they do the special type of treatment. Right. Within the courthouse themselves, as Gabriela Beltran described in her answers to discovery, they were subjected to a strip search at the courthouse itself. I think they were taken from the first floor to the basement. So that right there, Your Honor, is an indication that if jail personnel really believe that they were trying to smuggle something, they have already addressed that issue. Were they subjected to a body cavity search at the courthouse? No, they were not. There's no assertion that they were ever subjected to a body cavity search at the courthouse. But the sheriffs deny that there was ever a body cavity search. They deny that completely. Well, a body cavity search can be of two qualities. One can be physical and one can be visual. And the sheriffs do agree that they did a visual search. That's what they requested in the strip search authorization. That's what the sheriff's department requested in the strip search authorization form. They requested... You mean that the ladies who did it say that they did do a visual search, whatever that is, as opposed to a digital search. In fact, when it came to digital, one of them said, yuck, that would be really disgusting. But they admit they did a visual search. Yes, they do, Your Honor. They went to great lengths to describe the position of the clients and then they let those in and et cetera. They did a visual... Was that done at the courthouse too, that particular kind of visual search, body cavity search? Your Honor, I do not know if there was a visual body cavity search. I do know that there was a strip search, which would mean that, for example, the women would be asked to raise their breasts or to bend over to a certain extent. But there was no body cavity search, digital body cavity search, at the Compton Courthouse. Right. But the concern is this. If you have a concern about possible smuggling in of weapons or contraband or something, but you give the county everything that the district court gave them, this will be interpreted in the streets as a green light because of the fact that the county, even though Sheriff Baca says we do not permit excessive use of force, in the streets, in the ranks, they know they can get away with it. And that's been my experience. And so the remedy here, Your Honor, is that let's assume that you do not find that there is constitutional violations, constitutional injury, that you did not find that, for example, that we established a monolithic, that there was no policy, no moving force, no deliberate indifference to constitutional violations of excessive use of force. Nevertheless, you could still permit, you can reverse the district judge, you could say, well, that you should have permitted amending the complaint to add though defendants, which would also keep alive the state causes of action for assault and battery. Because that, in that fashion, the Sheriff's Department will know that even though the county employer may be absolved from constitutional violations, individual actions of the deputies will not be tolerated. And that's what I'm asking for, is a remedy. Because if individual deputies who engage in this behavior know that they can be subject at least to a civil suit, if not to a criminal prosecution or internal disciplinary within the Sheriff's Department, then that acts as some sort of a deterrent. Because what we have in this hopelessly slanted investigation is that in the jail, some of the women were treated differently than other traffic violators. And in the investigation, they were also treated differently. When you contrast the soft questioning of the investigators with deputies versus the questioning of the women and their witnesses, where they go to great lengths to discredit the women and Rebecca. And they don't do the same thing with regard to the sheriff's employees. They give them a free hand, so to speak. They don't grill them as you would normally interrogate someone who you are supposed to be investigating for criminal violations. They really don't interrogate in the normal context of when a suspect is really being interrogated by the police to cast them in contradictions, to give them false information, et cetera. They didn't do any of that. And so what they got was a pass. And when they got the pass, there was not enough in there for me to at the time have believed that Ponce and Cassidy were part and parcel with the investigators in this excessive use of force and in the subsequent cover up. But the depositions did explain how they went hand in hand together. In other words, Ponce didn't say when he was speaking to the sheriff's investigators, hey, listen, I ordered a good search. He didn't say any of that. And Cassidy, when he was speaking to the investigators, he acted like, well, I just walked through and I saw them there and they paid them no mind, something to that effect. But according to one of his own deputies, he ordered a continued waste chain of the two women. And so taken together, it should have been good cause for the court to permit. I'm anticipating a question. May I have some rebuttal time? Do I still have rebuttal time? Thank you. Good morning. May it please the Court. Cindy Lee for the defendants and appellees. Regarding the first issue of good cause, it's our contention that the Johnson v. Mammoth Recreations case is very analogous to the situation. There's been no showing of good cause. The district court, during oral argument, asked the plaintiff's counsel, what is your showing of good cause? And for the first time, plaintiff's counsel mentioned some trials, some health illnesses, et cetera. She didn't consider those allegations because that was given at the time of the hearing. In fact, if you look at the motion in the declaration in support of the plaintiff's motion for leave to amend, plaintiff's counsel concedes that he became aware of the identity of the Doe defendants, Does 1 through 4, in December 2001. So in the context, what plaintiff's counsel is indicating about these puzzles coming together after the depositions, when you look at the depositions that he's referring to, there's nothing new there. These are all the same allegations. If you look at plaintiff's complaint, original complaint and amended complaint, these allegations that it was Ponzi who alerted other sheriff's deputies about plaintiff's custody status and set in motion abuses committed by Sosa and Damaski, those were the same things that were testified to in depositions in May. And that's found in Excerpts of Record 353, 354. So with regards to the showing of good cause, there just wasn't any. He waited five months until after the deadline was imposed to amend the complaint at parties. We, in fact, had a meet and confer in April per Rule 7-3 regarding our grounds, our intentions of filing a summary judgment motion. He didn't indicate at any time that he wanted to amend anybody or he planned on making a motion. No good cause offered there. So with regards to the requirements for Rule 16b, plaintiff just failed to come forward with any showing of good cause, and the district court was within his or her discretion. Given that, with regards to the MSJ that was granted in favor of the county and Sheriff Baca, the district court considered the allegations and assumed, even assumed that there was a constitutional violation, and even assuming that, just plaintiffs failed to carry that extra burden of showing a policy, practice, or custom or deliberate indifference. So unless there's any other questions, I'll submit. Thank you. Okay. You wish to take a minute for rebuttal? Yes. I think you gave me at least one minute, correct? Thank you. Well, one of the things that I try to point out in my papers is that the so-called comprehensive report was not a comprehensive report as they want the court to believe. And the good cause that I was trying to explain to the district court was that even though Cassidy and Ponce were listed as witnesses, along with other deputies, about seven or eight other deputies, include total seven or eight of deputies, none of the information provided in the ICB report detailed exactly what had happened within their participation. And also, it was after the depositions were taken that the good cause became my burden then to show good cause. And apparently I didn't do it to the district court's satisfaction. But I believe that I was trying to explain that now we know what had happened. But in my reply papers to the district court, I explained the discrepancies between their statements, self-serving statements to the ICIB and what they really said at the deposition, which by itself would stand for good cause. And insofar as the scheduling order, that was amended, and the judge agreed to amend it insofar as one change in the scheduling order. But it shouldn't be a straitjacket. When there is, I believe good cause to amend. Thank you.
judges: Kozinski, Fernandez, Rymer